**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| SANDRA K. GARDNER, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| *versus* | § | CIVIL ACTION NO. H-05-4230 |
| | § | |
| MICHAEL J. ASTRUE, Commissioner | § | |
| of the Social Security Administration, | § | |
| | § | |
| *Defendant.* | § | |

**MEMORANDUM AND ORDER**

Pending before the court are Plaintiff Sandra K. Gardner (" Gardner") and Defendant

Michael J. Astrue' s, Commissioner of the Social Security Administration (the " Commissioner"),[1]

cross-motions for summary judgment.  Gardner appeals the determination of an Administrative

Law Judge (" the ALJ") that she is not entitled to receive Title II disability insurance benefits or

Title XVI supplemental security income benefits.  *See* 42 U.S.C. §§ 416(i), 423, 1382c(a)(3)(A).

Having reviewed the pending motions, the submissions of the parties, the pleadings, the

administrative record, and the applicable law, this Court is of the opinion that Gardner' s Motion

for Summary Judgment (Docket Entry No. 18) should be granted, the Commissioner' s Motion

for Summary Judgment (Docket Entry No. 20) should be denied, and the ALJ' s decision denying

benefits be reversed, and the case be remanded, pursuant to sentence four, to the Social Security

Administration (" SSA") for further proceedings.

---

[1]  Michael J. Astrue was sworn in as Commissioner of Social Security on February 12, 2007.  Pursuant
to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue should therefore be substituted
for Jo Anne B. Barnhart (former Commissioner) and Linda S. McMahon (interim acting Commissioner)
as the defendant in this suit.  No further action need be taken to continue this suit by reason of the last
sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

I.      *Background*

On February 7, 2003, Gardner protectively filed applications for disability insurance benefits and supplemental security income payments with the SSA, alleging disability beginning on October 8, 2001, as a result of seizures, high blood pressure, severe headaches, and back pain. (R. 107-109, 122, 331-333).  Both applications were denied at the initial and reconsideration levels.  (R. 335, 343).

Gardner requested, and was granted, a hearing before an ALJ to review the decisions.  (R. 27).  A hearing was held on October 18, 2004, in Houston, Texas, at which time the ALJ heard testimony from Gardner; Betty Jo Lucky, her daughter-in-law; Giao Hoang, M.D. ("Dr. Hoang"), a medical expert who is board-certified in internal medicine; and Wallace A. Stanfill, a vocational expert ("VE").  (R. 28-75).  In a decision dated December 11, 2004, the ALJ denied Gardner's applications for benefits.  (R. 13-26).  On February 8, 2005, Gardner appealed the ALJ's decision to the Appeals Council of the SSA's Office of Hearings and Appeals, which on October 7, 2005, declined to review the ALJ's determination.  (R. 5-7, 11).  This rendered the ALJ's opinion the final decision of the Commissioner.  *See Sims v. Apfel*, 530 U.S. 103, 107 (2000).  Gardner filed her original complaint in this case on December 12, 2005, seeking review of the Commissioner's denial of her claim for benefits.  *See* Docket Entry No. 1.

II.     *Analysis*

A.      *Statutory Bases for Benefits*

SSI benefits are authorized by Title XVI of the Act and are funded by general tax revenues. *See* SOCIAL SECURITY ADMINISTRATION, SOCIAL SECURITY HANDBOOK, § 2100 (14th ed. 2001). The SSI Program is a general public assistance measure providing an additional resource to the

aged, blind, and disabled to assure that their income does not fall below the poverty line.  *See* 20 C.F.R. § 416.110.  Eligibility for SSI is based upon proof of indigence and disability.  *See* 42 U.S.C. §§ 1382(a), 1382c(a)(3)(A)-(C).  A claimant applying to the SSI program cannot receive payment for any period of disability predating the month in which she applies for benefits, no matter how long she has actually been disabled.  *See Brown v. Apfel*, 192 F.3d 492, 495 n.1 (5th Cir. 1999); *see also* 20 C.F.R. § 416.335.  The applicable regulation provides:

> When you file an application in the month that you meet all the other requirements for eligibility, the earliest month for which we can pay you benefits is the month following the month you filed the application.  If you file an application after the month you first meet all the other requirements for eligibility, we cannot pay you for the month in which your application is filed or any months before that month.

20 C.F.R. § 416.335.  Thus, the month following an application, here, March 2003, fixes the earliest date from which benefits can be paid.  Eligibility for SSI payments, however, is not dependent on insured status.  *See* 42 U.S.C. § 1382(a).

Social Security disability insurance benefits are authorized by Title II of the Act and are funded by Social Security taxes.  *See also* SOCIAL SECURITY ADMINISTRATION, SOCIAL SECURITY HANDBOOK, § 2100.  The disability insurance program provides income to individuals who are forced into involuntary, premature retirement, provided they are both *insured* and *disabled*, regardless of indigence.  A claimant for disability insurance can collect benefits for up to twelve months of disability prior to the filing of an application.  *See* 20 C.F.R. §§ 404.131, 404.315; *see also Perkins v. Chater*, 107 F.3d 1290, 1295 (7th Cir. 1997).

While these are separate and distinct programs, applicants seeking benefits under either statutory provision must prove " disability" within the meaning of the Act, which defines disability in virtually identical language for both programs.  *See* 42 U.S.C. §§ 423(d), 1382c(a)(3),

1382c(a)(3)(G); 20 C.F.R. §§ 404.1505(a), 416.905(a).   Under both provisions, disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.  *See* 42 U.S.C. §§ 423(d)(1)(A), 1382c(3)(A).  Moreover, the law and regulations governing the determination of disability are the same for both disability insurance benefits and SSI.  *See Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), *cert. denied*, 514 U.S. 1120 (1995).

   B.   ***Standard of Review***

      1.   ***Summary Judgment***

   The court may grant summary judgment under FED. R. CIV. P. 56(c) when the moving party is entitled to judgment as a matter of law because there is no genuine issue as to any material fact.  The burden of proof, however, rests with the movant to show that there is no evidence to support the nonmoving party's case.  If a reasonable jury could return a verdict for the nonmoving party, then a motion for summary judgment cannot be granted because there exists a genuine issue of fact.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

   An issue of fact is "material" only if its resolution could affect the outcome of the case.  *See Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 189 (5th Cir. 1991).  When deciding whether to grant a motion for summary judgment, the court shall draw all justifiable inferences in favor of the nonmoving party, and deny the motion if there is some evidence to support the nonmoving party's position.  *See McAllister v. Resolution Trust Corp.*, 201 F.3d 570, 574 (5th Cir. 2000).  If there are no issues of material fact, the court shall review any questions of law *de novo*.  *See Merritt-Campbell, Inc. v. RxP Prods., Inc.*, 164 F.3d 957, 961 (5th Cir. 1999).  Once the movant

4

properly supports the motion, the burden shifts to the nonmoving party, who must present specific and supported material facts, of significant probative value, to preclude summary judgment.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *International Ass' n of Machinists & Aerospace Workers, AFL-CIO v. Compania Mexicana de Aviacion, S.A. de C.V.*, 199 F.3d 796, 798 (5th Cir. 2000).

### 2.    *Administrative Determination*

Judicial review of the Commissioner' s denial of disability benefits is limited to whether the final decision is supported by substantial evidence on the record as a whole and whether the proper legal standards were applied to evaluate the evidence.  *See Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002).   " Substantial evidence" means that the evidence must be enough to allow a reasonable mind to support the Commissioner' s decision; it must be more than a mere scintilla and less than a preponderance.  *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Masterson*, 309 F.3d at 272; *Brown*, 192 F.3d at 496.

When applying the substantial evidence standard on review, the court " scrutinize[s] the record to determine whether such evidence is present."  *Myers v. Apfel*, 238 F.3d 617, 619 (5th Cir. 2001) (citations omitted).   If the Commissioner' s findings are supported by substantial evidence, they are conclusive and must be affirmed.  *See Watson v. Barnhart*, 288 F.3d 212, 215 (5th Cir. 2002).   Alternatively, a finding of no substantial evidence is appropriate if no credible evidentiary choices or medical findings support the decision.  *See Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001).   The court may not, however, reweigh the evidence, try the issues *de novo*, or substitute its judgment for that of the Commissioner.  *See Masterson*, 309 F.3d at 272.  In short, " [c]onflicts in the evidence are for the Commissioner and not the courts to resolve."  *Id*.

C.    *ALJ's Determination*

An ALJ must engage in a five-step inquiry to determine whether the claimant is capable of performing "substantial gainful activity," or is, in fact, disabled:

1.    An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings.  *See* 20 C.F.R. §§ 404.1520(b), 416.920(b).

2.    An individual who does not have a "severe impairment" will not be found to be disabled.  *See* 20 C.F.R. §§ 404.1520(c), 416.920(c).

3.    An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.  *See* 20 C.F.R. §§ 404.1520(d), 416.920(d).

4.    If an individual is capable of performing the work she has done in the past, a finding of "not disabled" must be made.  *See* 20 C.F.R. §§ 404.1520(e), 416.920(e).

5.    If an individual's impairment precludes performance of her past work, then other factors, including age, education, past work experience, and residual functional capacity must be considered to determine if any work can be performed.  *See* 20 C.F.R. §§ 404.1520(f), 416.920(f).

*Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000); *accord Boyd*, 239 F.3d at 705.  The claimant has the burden to prove disability under the first four steps.  *See Myers*, 238 F.3d at 619.  If the claimant successfully carries this burden, the burden shifts to the Commissioner in step five to show that other substantial gainful employment is available in the national economy, which the claimant is capable of performing.  *See Masterson*, 309 F.3d at 272; *Greenspan*, 38 F.3d at 236.  If the Commissioner is able to verify that other work exists in significant numbers in the national economy that the claimant can perform in spite of his or her existing impairments, the burden shifts back to the claimant to prove that he or she cannot, in fact, perform the alternate work suggested.

6

*See Boyd*, 239 F.3d at 705.  A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis.  *See id.*

The mere presence of an impairment does not necessarily establish a disability. *See Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992).  An individual claiming disability benefits under the Act has the burden to prove that she suffers from a disability as defined by the Act.  *See Newton*, 209 F.3d at 452; *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990); *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988); *Cook v. Heckler*, 750 F.2d 391, 393 (5th Cir. 1985).  A claimant is deemed disabled under the Act only if she demonstrates an " inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  *Shave v. Apfel*, 238 F.3d 592, 594 (5th Cir. 2001); *accord Newton*, 209 F.3d at 452; *Crowley v. Apfel*, 197 F.3d 194, 197-98 (5th Cir. 1999); *Selders*, 914 F.2d at 618; *see also* 42 U.S.C. § 423(d)(1)(A).   " Substantial gainful activity" is defined as work activity involving significant physical or mental abilities for pay or profit.  *See Newton*, 209 F.3d at 452-53; *see also* 20 C.F.R. §§ 404.1572(a),(b), 416.972.

A medically determinable " physical or mental impairment" is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.  *See Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983); *see also* 42 U.S.C. § 423(d)(3).  " [A]n individual is ' under a disability, only if [her] impairments are of such severity that [s]he is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .' "  *Greenspan*,

38 F.3d at 236 (quoting 42 U.S.C. § 423(d)(2)(A)). This is true regardless of whether such work exists in the immediate area in which the claimant resides, whether a specific job vacancy exists, or whether the claimant would be hired if she applied. *See Oldham v. Schweiker*, 660 F.2d 1078, 1083 (5th Cir. 1981); *see also* 42 U.S.C. § 423(d)(2)(A).

In the case at bar, when addressing the first four steps, the ALJ determined:

1.  The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.

2.  The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3.  The claimant's petit mal seizures, low back pain, and hypertension are considered "severe" based on the requirements in the Regulations 20 C.F.R. §§ 404.1520(c) and 416.920(b).

4.  These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.  The claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

6.  The claimant has the residual functional capacity to perform light work as indicated by the Commissioner at 20 C.F.R. §§ 404.1567(b) and 416.967(b), with occasional stooping, twisting, crouching, kneeling and climbing of stairs or ramps; no crawling, balancing or climbing of ladders or scaffolds; and avoidance of hazards such as heights, vibration, and dangerous machinery.

7.  The claimant's past relevant work as secretary, receptionist, and sales representative did not require the performance of work-related activities precluded by her residual functional capacity (20 C.F.R. §§ 404.1565 and 416.965)

8.  The claimant's medically determinable petit mal seizures, low back pain, and hypertension do not prevent the claimant from performing her past relevant work.

9.     The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of the decision (20 C.F.R. §§ 404.1520(f) and 416.920(f)).

(R. 25-26). Because the ALJ determined that Gardner could perform her past relevant work, he did not reach step five in the sequential evaluation process.

This court's inquiry is limited to a determination of whether there is substantial evidence in the record to support the ALJ's findings and whether the proper legal standards have been applied. *See Masterson*, 309 F.3d at 272; *Watson*, 288 F.3d at 215; *Myers*, 238 F.3d at 619; *Newton*, 209 F.3d at 452; *Greenspan*, 38 F.3d at 236; *see also* 42 U.S.C. §§ 405(g), 1383(c)(3). To determine whether the decision to deny Gardner's claim for disability benefits is supported by substantial evidence, the court weighs the following four factors: (1) the objective medical facts; (2) the diagnoses and opinions from treating and examining physicians; (3) the plaintiff's subjective evidence of pain and disability, and any corroboration by family and neighbors; as well as, (4) the plaintiff's age, educational background, and work history. *See Martinez v. Chater*, 64 F.3d 172, 174 (5th Cir. 1995); *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991) (citing *DePaepe v. Richardson*, 464 F.2d 92, 94 (5th Cir. 1972)). Any conflicts in the evidence are to be resolved by the ALJ and not the court. *See Newton*, 209 F.3d at 452; *Brown*, 192 F.3d at 496; *Martinez*, 64 F.3d at 174; *Selders*, 914 F.2d at 617.

**D.     Issues Presented**

Gardner contends that the decision of the ALJ is not supported by substantial evidence. Specifically, Gardner claims that the ALJ erred by: (1) improperly assessing her residual functional capacity and relying on testimony given to a hypothetical comprised of that assessment; and (2) failing to follow the proper procedure used to evaluate the severity of mental impairments pursuant

to 20 C.F.R. § 404.1520a.   *See* Docket Entry No. 19.   The Commissioner disagrees with

Gardner's contentions, maintaining that the ALJ's decision is supported by substantial evidence.

*See* Docket Entry No. 21.

     **E.**      *Review of the ALJ's Decision*

       **1.**      *Objective Medical Evidence and Opinions of Physicians*

     When assessing a claim for disability benefits, "[i]n the third step, the medical evidence

of the claimant's impairment is compared to a list of impairments presumed severe enough to

preclude any gainful work." *Sullivan v. Zebley*, 493 U.S. 521, 525 (1990).   If the claimant is not

actually working and her impairments match or are equivalent to one of the listed impairments, she

is presumed to be disabled and qualifies for benefits without further inquiry.   *See id.* at 532; *see*

*also* 20 C.F.R. § 416.920(d).   When a claimant has multiple impairments, the Act requires the

Commissioner to "consider the combined effect of all of the individual's impairments without

regard to whether any such impairment, if considered separately, would be of such severity."   42

U.S.C. § 423(d)(2)(B); *see Zebley*, 493 U.S. at 536 n.16; *Loza v. Apfel*, 219 F.3d 378, 393 (5th

Cir. 2000).   The relevant regulations similarly provide:

> In determining whether your physical or mental impairment or impairments are of
> a sufficient medical severity that such impairment or impairments could be the basis
> of eligibility under the law, we will consider the combined effect of all of your
> impairments without regard to whether any such impairment, if considered
> separately, would be of sufficient severity.   If we do find a medically severe
> combination of impairments, the combined impact of the impairments will be
> considered throughout the disability determination process.   If we do not find that
> you have a medically severe combination of impairments, we will determine that
> you are not disabled.

20 C.F.R. §§ 404.1523, 416.923; *see also Loza*, 219 F.3d at 393.   The ALJ must address the

degree of impairment caused by the combination of physical and mental medical problems.   *See*

*Gibson v. Heckler*, 779 F.2d 619, 623 (11th Cir. 1986) (citations omitted).  The medical findings of the combined impairments are compared to the listed impairment most similar to the claimant's most severe impairment.  *See Zebley*, 493 U.S. at 531.

The claimant has the burden to prove at step three that her impairment or combination of impairments matches or is equivalent to a listed impairment.  *See id.* at 530-31; *Selders*, 914 F.2d at 619.  The listings are descriptions of various physical and mental illnesses and abnormalities, most of which are categorized by the body system they affect.  *See Zebley*, 493 U.S. at 529-30. Each impairment is defined in terms of several specific medical signs, symptoms, or laboratory test results.  *See id.* at 530.  For a claimant to demonstrate that her disorder matches an Appendix 1 listing, it must meet *all* of the specified medical criteria.  *See id.* (emphasis in original).  An impairment that manifests only some of those criteria, no matter how severely, does not qualify.  *See id.*

For a claimant to qualify for benefits by showing that her unlisted impairment, or combination of impairments, is equivalent to a listed impairment, she must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment.  *Id.* at 531 (emphasis in original) (citing 20 C.F.R.  § 416.926(a)).  A claimant's disability is equivalent to a listed impairment if the medical findings are at least equal in severity and duration to the listed findings. *See* 20 C.F.R.  §§ 404.1526(a), 416.926(a).  The applicable regulation further provides:

(1)(i)  If you have an impairment that is described in the Listing of Impairments in Appendix 1 of Subpart P of this chapter, but—

(A) You do not exhibit one or more of the medical findings specified in the particular listing, or

11

  (B)   You exhibit all of the medical findings, but one or more of the findings is
not as severe as specified in the listing;

  (ii)   We will nevertheless find that your impairment is medically equivalent to
that listing if you have other medical findings related to your impairment that are
at least of equal medical significance.

*Id.*   Nonetheless, " [a] claimant cannot qualify for benefits under the ' equivalence' step by

showing that the overall functional impact of his unlisted impairment or combination of

impairments is as severe as that of a listed impairment." *Zebley*, 493 U.S. at 531.  Ultimately, the

question of equivalence is an issue reserved for the Commissioner.  *See Spellman v. Shalala*, 1

F.3d 357 (5th Cir. 1993); 20 C.F.R.   §§ 404.1527(e), 416.927(e).

    A review of the medical records submitted in connection with Gardner's administrative hearing

reveals extensive treatment for mental illness and seizures.  On October 30, 2002, Gardner consulted

Mohammad Athari, M.D. ("Dr. Athari") for weight gain and counseling.  (R. 250).  Dr. Athari

diagnosed Gardner with hypertension and depression. (R.250).  On November 15, 2002, Gardner saw

Dr. Athari due to "pass out" episodes and high cholesterol.  (R. 250).  At that time, Dr. Athari

diagnosed Gardner with seizure disorder.  (R. 250).  Five days later, Dr. Athari requested an EEG[2]

and prescribed Depakote[3] for seizure control.  (R. 203).  Gardner listed medications she currently took

---

[2]   An EEG (electroencephalogram) is " a recording of the potentials on the skull generated by currents
emanating spontaneously from nerve cells in the brain.  Fluctuations in potential are seen in the form of
waves, which correlate well with different neurologic conditions and so are used as diagnostic criteria."
*See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 575 (29th ed. 2000).

[3]   Depakote is the trademark for a preparation of divalproex sodium.  *See* DORLAND'S, *supra*, at 476. It is
used to treat manic episodes associated with bipolar disorder and epileptic seizures, particularly absence
seizures (*i.e.*, petit mal seizures).  *See id.* at 536.

as Diovan, Premarin, Allegra, Paxil[4], and Butomedine.  (R. 177).  In a letter dated November 26, 2002, Dr. Athari indicated Gardner responded well to Depakote and was free of generalized seizures.[5] (R. 198).  He further determined that Gardner's MRI and EEG were grossly normal.  (R. 198).

Gardner was seen again by Dr. Athari on January 16, 2003, when she reported four seizure episodes since her last visit.  (R. 194).  Gardner stated she felt much better and had no seizure activity when taking medication; however, she did report four seizure episodes, therefore Dr. Athari increased her Depakote level.  (R. 194).  Once again on February 06, 2003, Gardner reported seizure activity to Dr. Athari.[6]  (R. 191).  Dr. Athari indicated Gardner had a personal disability and could not work or drive due to seizure disorder to the Texas Department of Human Services on February 20, 2003. (R. 168).  On the same day, Dr. Athari prescribed Trileptal[7] along with Depakote.  (R. 187).

On March 12, 2003, Dr. Athari reported Gardner was stable and had no seizure episodes on Trileptal and Depakote.  (R. 207).  On March 27, 2003, however, Dr. Athari reported Gardner to have

---

[4]  Paxil is the trademark for the preparation of paroxetine hydrochloride.  *See* DORLAND'S, *supra*, at 1325. It  is a selective serotonin reuptake inhibitor used in the treatment of depression, obsessive-compulsive disorder, and panic disorder.  *See id.* at 1339.

[5]  " Generalized seizures" (*i.e.*, grand mal seizures), are characterized by a loss of consciousness and tonic convulsions followed by clonic convulsions over the entire body.  *See* DORLAND'S, *supra*, at 1619.  Clonic convulsions are "marked by alternating contracting and relaxing of the muscles" while tonic convulsions are "prolonged contraction of the muscles, as a result of an epileptic discharge."  *Id.* at 400.

[6]  Gardner still experienced absence seizures (petit mal) (R. 191), which consist of sudden lapses of consciousness along with " automatisms or clonic movements, especially of the eyelids."  *See* DORLAND'S, *supra*, at 1618.

[7]  Trileptal (Tegretol) is the trademark for preparations of carbamazepine.  *See* DORLAND'S, *supra*, at 1794. It is used in the treatment of pain associated with epilepsy manifested by partial seizures (partial seizures occur due to a lesion in a specific known area).  *See id.* at 281.

1 to 8 generalized absence seizures per week and 3 to 4 complex partial (temporal lobe seizures)[8] per week; he believed that Gardner was compliant with medicine.  (R. 162).  Around the same time, the record shows Gardner was having lower back pain, for which Dr. Athari gave her a trigger point injection to the scapular region[9] on the right side.  (R. 207).

Gardner underwent a mental status examination performed by Mark Lehman, Ph.D. ("Dr. Lehman") on  May 5, 2003.  (R. 208).  A review of Gardner's activities revealed she was independent in grooming, personal hygiene, bathing and dressing herself.  (R. 209).  She did not drive due to seizures and reported to spend her days watching television, doing light household chores, sitting in the yard, and taking short walks around the neighborhood. (R. 209).  Dr. Lehman also noted Gardner only socialized with her immediate family and went to church once a week.  (R. 210).  He did not note any significant cognitive impairment but did report Gardner's "depression and anxiety to be of sufficient severity to cloud her judgment and decision making if not medically managed."  (R. 210).  For episodes of decompensation and resulting effects, Dr. Lehman reported Gardner's "condition to have been stable under medical management for many years."  (R. 210).  Dr. Lehman diagnosed

---

[8]  Complex partial seizures are " a type of partial seizure associated with disease of the temporal lobe and characterized by varying degrees of impairment of consciousness; the [person] performs automatisms and is later amnesic for them.  An attack is often preceded by a hallucinatory aura, most often visual or auditory."  *See* DORLAND'S, *supra*, at 1619.  Gardner never experienced hallucinations.  (R. 209).

[9]  The injection was administered in Gardner' s right shoulder blade (R. 207).  *See* DORLAND'S, *supra*, at 1605.

Gardner with Bipolar Disorder NOS, provisional,[10] as reported by client, with a Global Assessment of Functioning ("GAF") score of 50[11] and a prognosis that with psychiatric treatment, Gardner's depression and anxiety may improve.  (R. 212).

On June 11, 2003, Gardner was seen by Anita Kuruvilla, M.D. ("Dr. Kuruvilla") complaining of "severe pain in the back of the neck radiating to the right upper extremity, trunk, and right lower extremity." (R. 215).  During that consultation, Gardner told Dr. Kuruvilla that she had approximately 3 to 4 seizures a month and was "noncompliant with medications due to financial problems." (R. 215). Dr. Kuruvilla's impressions were that Gardner suffered from "[p]etit mal seizures, increased frequency of attacks due to noncompliance with medications due to financial problems," "[c]hronic low back pain, without much limitation in the activities," and "[h]ypertension controlled on medications." (R. 219).

On July 8, 2003, Gardner requested Depakote refills.  (R. 248).  Approximately one week later, on July 14, 2003, she underwent a physical residual function examination by Albert E. Ponterio, M.D. ("Dr. Ponterio").  (R. 221-228).  Dr. Ponterio reported that Gardner could occasionally lift 50 pounds, frequently lift 25 pounds, and stand and sit for 6 hours in an 8-hour working day, with an

---

[10]  "Bipolar Disorder Not Otherwise Specified" includes mental disorders with bipolar features that do not meet the criteria for any specific Bipolar Disorder; (e.g., rapid alternation between manic symptoms and depressive symptoms that do not meet minimal duration criteria for other types of Bipolar Disorder, hypomanic episodes, along with chronic depressive symptoms occurring too infrequently, or hypomanic episodes occurring without intercurrent depressive symptoms. *See* AMERICAN PSYCHIATRIC ASSOCIATION: DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS ("DSM-IV-TR") 400 (4th ed. 2000).

[11]  A GAF score represents a clinician's judgment of an individual's overall level of functioning. *See* DSM-IV-TR, *supra*, at 32.  The reporting of overall functioning is done by using the GAF Scale, which is divided into ten ranges of functioning.  The GAF rating is within a particular decile if either the symptom severity or the level of functioning falls within the range.  A GAF rating of 50 indicates serious symptoms (*e.g.*, suicidal ideation, sever obsessional rituals, frequent shoplifting); or any serious impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job). *See id.* at 34.

unlimited ability to push and/or pull.  (R. 222).  Impairments were found in Gardner's ability to climb ladders and occasional limitations on stooping, crouching, and climbing stairs, as well as machinery and heights avoidance.  (R. 223-225).

A psychological evaluation and mental residual function examination took place on the same day as the physical.  (R. 229).  Charles Lankford, Ph.D. ("Dr. Lankford"), determined Gardner suffered from Bipolar Disorder NOS–provisional syndrome, but did not meet the criteria to be diagnosed with an affective disorder.  (R. 229-232).  Dr. Lankford noted a moderate limitation in restriction of daily activities and difficulties in maintaining social functioning.  (R. 239).  Only a mild limitation was found regarding Gardner's difficulties in maintaining concentration, persistence, or pace and no episodes of decompensation were found.  (R. 239).  The residual function evaluation determined Gardner to be moderately limited in her ability to understand, remember, and carry-out very short and simple instructions as well as her ability to work in coordination with or proximity to others without being distracted by them.  (R. 243).  Gardner was also found to be moderately limited in her ability to accept instructions and respond appropriately to criticism from supervisors, to respond appropriately to changes in the work setting, and in her ability to travel in unfamiliar places or use public transportation.  (R. 244).  Dr. Lankford only noted a marked limitation in Gardner's ability to understand, remember, and carry-out detailed instructions.  (R. 243).

Gardner began treatment for epilepsy at the University of Texas Medical Branch at Galveston ("UTMB") on August 20, 2003.  (R. 300).  During her first visit, she complained of seizures and it was noted she may have seizures 3 to 4 times per week even on medicine.  (R. 301).  It was also noted Gardner was at the time taking Depakote for her seizures, pain relievers for her back pain, but was no longer taking Paxil for Bipolar Disorder.  (R. 302).

16

On September 3, 2003, Gardner visited the UTMB Epilepsy Clinic, where she was assessed as having complex partial seizures with secondary generalization and was told her Depakote level would be increased and she would start taking Paxil again.  (R. 297-298).  It was noted some of the descriptions of her seizures seemed real while others appeared atypical.  (R. 298).

On September 8, 2003, Gardner visited to Tri-County MHMR (indigent care) where she indicated she would enroll in the county indigent healthcare plan.  (R. 267).  At a later visit to UTMB Telemedicine Clinic, on September 17, 2003, it was noted that indigent healthcare would not pay for Paxil and that Gardner may be able to obtain it from Tri-County or find another program to pay for it.  (R. 295).  It was also reported that she was having seizures on Depakote but the seizures were not as bad when she was on Paxil.  (R. 295).  An MRI dated October 1, 2003 showed a mild periventricular and deep white matter ischemic[12] changes present; otherwise the results were normal.  (R. 292).  Another EEG was also done at that time and appeared normal with no epileptiform discharges.  (R. 293).

On November 5, 2003, Gardner visited UTMB complaining of seizures, exacerbated from stress due to her father's passing away, even while taking Depakote and Paxil.  (R. 289).  It was noted on January 7, 2004, that Gardner had been off Paxil for a month, thus Tri-County assessment plan was to get her back on Paxil (R. 258), which did not occur, as on February 11, 2004, Gardner went back for a follow-up at UTMB Epilepsy Clinic where she reported increased problems due to her inability to fill her prescriptions.

_____

[12]  Ischemic pertains to a deficiency of blood.  *See* DORLAND'S, *supra*, at 920.  In this matter, ischemic changes were present around Gardner's brain ventricle (a cavity within the brain filled with cerebrospinal fluid) and deep white matter (also known as "substantia alba," *i.e.*, the conducting portion of the brain).  *See id.* at 1721, 1955.

> Ms. Gardner reports that she has been without medication for the past three weeks due
> to problems with the indigent care program in her county.  This has happened to her
> in the past and it has generally led to an increase in seizures.  She reports that she has
> been experiencing an increase in seizures since she has been without medication.  She
> also reports an increase in anxiety, which has been a problem for many years.  She
> requests additional medications to help with seizure control and relief from the
> symptoms of anxiety.

(R. 313).

On February 23, 2004, Gardner visited the emergency room of UTMB Hospital with a reported chief complaint of "[d]eep, deep depression," increased seizure activity, and suicidal ideation. (R. 279).  It was noted that Gardner was on Paxil and had Depakote levels of 87[13] and that she was compliant with medication, except for a period of three weeks when she was financially unable to fill her prescriptions.  (R. 282).  At that time, the record indicates the family reported the seizures to behave as "spells," and the examiner noted it was unclear whether the episodes were neurological, psychological, or a blend of the two.  (R. 284).  The family also reported worsening of cognitive ability, depression, and irritability.  (R. 284).  During that visit, while waiting in the lobby, an ER technician went to check on Gardner, after a family member reported she was having a seizure, and observed the left side of her face twitch for approximately one minute, after which she opened her eyes spontaneously, answered orientation questions, and walked to the triage desk.  (R. 305).  It was then reported that Gardner had another episode at the triage desk.  (R. 305).  At the hospital, triage nurses indicated the episode witnessed by the ER technician and family reports of numerous seizures while in triage.  (R. 306-307).  The primary discharge diagnosis was suicidal ideation with discharge

---

[13]   Therapeutic levels of Depakote are within the range of 50 to 100.  (R. 207).

instructions for depression and seizures followed by drug instructions for antidepressants and serotonin reuptake medications.[14]  (R. 307).

After being released, Gardner went back to UTMB Epilepsy Clinic on February 25, 2004. (R. 277).  Jeanette Hartshorn, R.N., Ph.D., C.N.S. ("Dr. Hartshorn"), reported Gardner's daughter-in-law believed Depakote was the cause of Gardner's recent problems and that Depakote would be stopped at patient's request in spite of patient's understanding seizures may occur off the medication. (R. 277-278).  During a follow-up, Dr. Hartshorn noted Gardner reportedly experienced seizures when she became upset, including one which Dr. Hartshorn witnessed and described as a "seizure" experienced in the waiting room evidenced by Gardner's body becoming rigid followed by ten minutes of her rhythmically banging her head against the wall while still being alert and responsive to commands.  (R. 275).  The family reported that Paxil had helped but requested additional medication to control anxiety.  (R. 275).  Gardner was told to continue Paxil and start Clonazepam[15] for seizures and anxiety.  (R. 275).

On March 3, 2004, during a visit to UTMB Telemedicine Clinic, Gardner reported being off all medication and having less anxiety attacks off medication.  (R. 272).  Gardner reported she would try Klonopin (Clonazepam) at Dr. Hartshorn's suggestion.  (R. 273).  During the visit, a nurse observed Gardner nodding her head and rolling her eyes back into her head, appearing unresponsive; however, she was able to continue holding a cup of coffee in one had while sitting upright.  (R. 273).

On a follow-up visit at Tri-County, on April 14, 2004, Gardner was seen for treatment

---

[14]  Serotonin reuptake inhibitors stop the reabsorption of previously secreted serotonin.  *See* DORLAND'S, *supra*, at 1569. They are often used as anti-depressants.  *Id.* at 1629.

[15]  Clonazepam is a benzodiazepine used as an anticonvulsant in the treatment of seizures.  *See* DORLAND'S, *supra*, at 365.

regarding her hospitalization for depression.  (R. 254).  It was reported she would continue to take

Paxil, and she was given free samples at that time.  (R. 255).

Another visit to UTMB on April 28, 2004, indicated Gardner was not taking Paxil but was on

Klonopin.  (R. 270).  She reported two seizures in the past two weeks and felt they were stress related.

(R. 270).  Gardner also complained of depression and pain in her lower extremities evidenced by a

pitting edema on lower legs.  (R. 270).

### a.       *Evaluation of Gardner's Mental Impairments*

Gardner claims that the ALJ failed to follow the proper method to evaluate the severity of her

mental impairments pursuant to 20 C.F.R. § 404.1520a(c)(3) and improperly found that those mental

impairments were not severe.  *See* Docket Entry No. 19.

"The Commissioner has instituted a corollary procedure for determining the merits of  mental

disability claims," in accord with 20 C.F.R. § 404.1520a.  *See Boyd*, 239 F.3d at 705.  The regulation

calls for a determination of whether a claimant has a "medically determinable impairment" by

evaluating the "symptoms, signs, and laboratory findings" in the record.  *See* 20 C.F.R.

§ 404.1520a(b)(1).  If a medically determinable impairment is found, the next step is to rate the degree

of a claimant's functional limitation based on the extent to which the impairment limits the claimant's

"ability to function independently, appropriately, effectively, and on a sustained basis" in "four broad

functional areas."  *See* 20 C.F.R §§ 404.1520a(c)(2), (c)(3).  Those areas include: activities of daily

living; social functioning; concentration, persistence, or pace; and episodes of decompensation.  20

C.F.R. § 404.1520a(c)(3).  To evaluate the degree of limitation in the first three areas (*i.e.*, activities

of daily living; social functioning; and concentration, persistence, or pace) the regulation calls for a

five-point scale, comprised of: none, mild, moderate, marked, and extreme.  *See* 20 C.F.R.

§ 404.1520a(c)(4).  In the fourth area (*i.e.*, episodes of decompensation) the scale used is comprised of four points: none, one or two, three, and four or more.  *Id.*

"The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity".  *Id.*  If, however, the ALJ rates the degree of limitation in the first three areas as "none" or "mild" and "none" in the fourth area, he may generally conclude the impairment as non-severe, "unless the evidence otherwise indicates that there is more than a minimal limitation in [claimant's] ability to do basic work activities."  *Id.* at § 404.1520a(d)(1).  The ALJ must document the application of the technique in the decision as set forth in 20 C.F.R. § 404.1520a(e).

In this case, the ALJ followed the technique specified in 20 C.F.R. § 404.1520a(c)(3) and found that:

> [i]n her activities of daily living, the claimant testified that she cooks, goes and buys groceries, reads her Bible, watches television, makes and receives visits, and drives an automobile.  She does not allege having any side-effects from taking her medications. The claimant's daughter-in-law, Betty Joe Lucky, testified and corroborated the claimant's testimony.

(R. 23).  Although the ALJ documented application of the technique in his decision, the ALJ's findings directly contradict the testimony of Gardner and Betty Jo Lucky as well as the record as a whole.  In fact, Gardner's testimony revealed that she did not drive, did not perform household chores in the manner the ALJ described, and did suffer from side-effects from her medication.

> Q:  And what do you do around the house?
> A:  Watch TV.
> Q:  Do you do any of the housework?
> A:  No.  Sometimes Betty Jo lets me follow her around, and we pretend I'm helping, but it's not always a thing of pretend.  I have a 3-year-old granddaughter.  We dust about the same caliber, so – I do make my own bed. It's not always very good, but I try to do that.
> Q:  And I think you said something about cooking.  How do you cook?

21

A:     I am a supervised cooker.  Anything that I cook, someone watches to make sure, because I've left stuff on the stove and caused to catch on fire before...

Q:     Do you help buy groceries?  Do you go out to buy the groceries with them, or go shopping?

A:     If there's no one to stay with me, I have to go.

Q:     Okay.  You have any hobbies you like to do at home?

A:     I do, Your Honor, but I pretty much forgot how to do them.

Q:     Okay, what about reading?  Do you read at home?

A:     I read my Bible.

Q:     And do you make any visits to your family and friends, or do they visit you?

A:     I go and see my mama, and I go see my friend, Steven.  Because they have read all of the literature, and they know what to do.

Q:     You have a driver's license.  Is that right?

A:     Yes, sir, I do.  But I do not drive, and have not for way over a year.

Q:     You able to dress yourself, take a shower, bath, that kind of thing?

A:     Yeah, I do.  I'm checked on quite frequently, but I do...

Q:     Okay.  So the side effects from the medication was keeping you sleepy?

A:     Sleepy.  And I wouldn't be awake sometimes an hour...and I would have a seizure.  And I mean, basically, I woke up and they fed me, and I went back to bed.

(R. 39-48).

Betty Jo Lucky corroborated Gardner's testimony regarding Gardner's daily activities, and did not, as the ALJ indicated, state that Gardner was independent.  Betty Jo Lucky testified that Gardner came to live with her because Gardner's sister no longer wanted to care for her due to Gardner's condition.  When the ALJ asked Betty Joe Lucky what had to be done for Gardner, she testified as follows:

A.     To drive her to all her appointments.  To make sure that she – you know, she doesn't get into anything, she doesn't leave anything on.  They got in a huge argument because she would try to put the simmering pots out for [INAUDIBLE], and she'd leave it on, the simmering pot on the stove.  And it would dry out, and things caught on fire, and they were scared that she was going to burn their house.

(R. 53).  Contrary to the ALJ's finding, the record does not indicate Gardner drove an automobile; in fact, all of the evidence in the record indicates otherwise.  (R. 168, 209, 241).

The ALJ's findings regarding Gardner's daily activities are also inconsistent with the medical evidence. When he assessed Gardner's daily activities, the ALJ based his findings on Dr. Lehman's May 5, 2003, psychological evaluation and not Gardner's testimony as mentioned. (R. 208). The ALJ's decision outlined some of Dr. Lehman's findings, but not all. In this regard, the ALJ noted as to Gardner's activities of daily living that:

> she was independent in grooming and personal hygiene and was able to bathe and dress herself without assistance. It was also noted that she performs light chores around her home and helps her daughter-in-law prepare meals. She reportedly spends her day watching television, doing light household chores, sitting in the yard, and taking short walks around the neighborhood. Socially, it was noted that the claimant socializes with her immediate family and, attends religious services once a week. The evaluating physician indicated that the claimant's condition appeared to have been stable under medical management for many years.

(R. 18). Although the ALJ did not include this information in his decision, Dr. Lehman also found that Gardner "does not operate a motor vehicle . . . performs light chores around the home and helps her daughter prepare meals . . . is unable to shop independently . . . and spends her days watching television, doing light household chores, sitting in the yard, and taking short walks around the neighborhood." (R. 209).

The ALJ further noted that "[t]he evaluating physician indicated that the claimant's condition appeared to have been stable under medical management for many years;" however, Dr. Lehman made that determination under his evaluation of episodes of decompensation and resulting effects, which was the area he found Gardner's condition to appear to have been stable. (R. 210). The ALJ appears to have taken Dr. Lehman's statement out of context and applied it to Gardner's entire mental evaluation and not just the evaluation of one area (*i.e.*, episodes of decompensation). Furthermore, Dr. Lehman was not Gardner's treating physician. (R. 209). Gardner sought treatment for her mental impairments

from Tri-County; Dr. Lehman only performed one mental evaluation. (R. 209, 253-267). Finally, the ALJ also failed to recognize that Drs. Lehman and Lankford assigned Gardner a GAF score of 50 (R. 212, 229-243). *See Howard v. Commissioner of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002) (A GAF score is not a determiner of an ability to work; however, an ALJ should consider it as part of the medical evidence). Here, the ALJ failed to discuss evidence in record which contradicted his decision and took evidence out of context. (R. 16-26, 229, 239-245). "[T]he ALJ must consider all the record evidence and cannot 'pick and choose' only the evidence that supports his position." *Loza*, 219 F.3d at 393.

Moreover, the ALJ incorrectly found that Gardner had not been hospitalized as a result of mental illness. (R. 18). Gardner was admitted on February 23, 2004, due to a chief complaint of " deep, deep, depression" with suicidal ideation. (R. 279). Although Gardner's medical records evidence many doctor visits with complaints of depression, the ALJ dismissed those visits in evaluating her mental illness, asserting that Gardner's main complaint resulted from her seizure disorder. (R. 250, 267, 258, 275, 254, 270).

The ALJ may consider a claimant's failure to seek medical treatment in evaluating the severity of an alleged mental impairment, in conjunction with other factors. *See Villa v. Sullivan*, 895 F.2d 1019, 1024 (5th Cir. 1990). Although Gardner did not consistently see a psychiatrist or a psychologist, Gardner was treated for mental illness with anti-depressants, mostly Paxil. (R. 177, 255, 258, 269-275, 282, 289, 295, 297-299). During many visits to her treating physician, Gardner obtained refills for anti-depressants and continuously alleged impairments due to depression. (R. 253-267).

The Commissioner argues that Gardner failed to show that she has severe depression which is uncontrollable with proper treatment (*i.e.*, medication).  Hence, the Commissioner contends that the ALJ properly omitted mental limitations from his assessment of Gardner's residual functional capacity.  *See* Docket Entry No. 21.  Contrary to the Commissioner's contention, Gardner's failure to obtain Paxil at times was due to her inability to afford medication.  "If [ ] [a] claimant cannot afford the prescribed treatment or medicine, and can find no way to obtain it, 'the condition that is disabling in fact continues to be disabling in law.'"  *Lovelace v. Bowen*, 813 F.2d 55, 59 (5th Cir. 1987) (citing *Taylor v. Bowen*, 782 F.2d 1294, 1298 (5th Cir. 1986)).  Although the record reveals that Gardner chose to stop taking Paxil around March, 2004, she resumed treatment with Paxil in conjunction with other anti-depressants in April, 2004.  (R. 269-275). The record appears to indicate that any period of time Gardner was not taking anti-depression medication resulted from financial difficulties.  (R. 177-327).

Because the ALJ improperly failed to consider all of the evidence pertaining to Gardner's alleged mental impairments, the decision is not supported by substantial evidence.  As such, the case must be remanded for full consideration of Gardner's alleged mental impairments.

**b.**   ***Evaluation of Gardner's Seizure Disorder***

Although Gardner complains that the ALJ erred by not finding her seizure disorder to be severe, the record evidence indicates conflicting evidence regarding the severity of Gardner's seizures while on medication.   There is a presumption of disability when a claimant has nonconvulsive epilepsy (petit mal, psychomotor, or focal) if it is "documented by a showing of a typical seizure patter, including all associated phenomena, occurring more than once weekly, *in spite of at least three months of prescribed treatment*" along "with alteration of awareness or loss

25

of consciousness and transient postical manifestations of unconventional behavior or significant interference with activity during the day." 20 C.F.R. Pt. 404, Subpt. P., App 1, Section 11.03 (emphasis added).

Based on the medical records and the testimony of Dr. Hoang, the ALJ determined that Gardner's seizures were under control when she took her medication (*i.e.*, Depakote). (R. 21-22). The ALJ found that, when on medication, Gardner had good control of her seizure activity. (R. 21). To the extent Gardner argues that the ALJ should have considered whether she was financially unable to obtain her medication, this point is moot because on February 25, 2004, Gardner and her daughter-in-law requested that she be taken off Depakote, knowing that a seizure may occur. (R. 21-22, 277-278, 282, 313). Hence, the ALJ correctly found that Gardner did not have a severe impairment due to seizures because an impairment that can be controlled with medication is not disabling. *See Johnson v. Bowen*, 864 F.2d 340, 348 (5th Cir. 1988); *see also Lovelace*, 813 F.2d at 59; 20 C.F.R. §§ 404.1530, 416.930.

### 2. *Subjective Complaints*

The law requires the ALJ to make affirmative findings regarding a claimant's subjective complaints. *See Falco v. Shalala*, 27 F.3d 160, 163 (5th Cir. 1994) (citing *Scharlow v. Schweiker*, 655 F.2d 645, 648-49 (5th Cir. 1981)). When a plaintiff alleges disability resulting from pain, he must establish a medically determinable impairment that is capable of producing disabling pain. *See Ripley*, 67 F.3d at 556 (citing 20 C.F.R. § 404.1529). Once a medical impairment is established, the subjective complaints of pain must be considered along with the medical evidence in determining the individual's work capacity. *See id.* It is well settled that an ALJ's credibility findings on a claimant's subjective complaints are entitled to deference. *See Chambliss v.*

*Massanari*, 269 F.3d 520, 522 (5th Cir. 2001); *Scott v. Shalala*, 30 F.3d 33, 35 n.2 (5th Cir. 1994); *Falco*, 27 F.3d at 164; *Wren*, 925 F.2d at 128.   The Fifth Circuit recognizes that " the ALJ is best positioned" to make these determinations because of the opportunity to observe the claimant first-hand.   *See Falco*, 27 F.3d at 164 n.18.   Moreover, " [t]he Act, regulations and case law mandate that the Secretary require that subjective complaints be corroborated, at least in part, by objective medical findings."   *Harrell v. Bowen*, 862 F.2d 471, 481 (5th Cir. 1988) (citing 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 404.1529; *Owens v. Heckler*, 770 F.2d 1276, 1281-82 (5th Cir. 1985)); *accord Chambliss*, 269 F.3d at 522 (citing *Houston v. Sullivan*, 895 F.2d 1012, 1016 (5th Cir. 1989)); *Hampton v. Bowen*, 785 F.2d 1308, 1309 (5th Cir. 1986).

As a matter of law, the mere fact that working may cause a claimant pain or discomfort does not mandate a finding of disability.   *See Hames*, 707 F.2d at 166; *Epps v. Harris*, 624 F.2d 1267, 1274 (5th Cir. 1980); *accord Brown v. Bowen*, 794 F.2d 703, 707 (D.C. Cir. 1986). Additionally, the mere existence of pain does not automatically bring a finding of disability. *Harper v. Sullivan*, 887 F.2d 92, 96 (5th Cir. 1989); *Owens*, 770 F.2d at 1281.   It must be determined whether substantial evidence indicates an applicant can work despite being in pain or discomfort.   *See Chambliss*, 269 F.3d at 522; *Johnson v. Heckler*, 767 F.2d 180, 182 (5th Cir. 1985).

For pain to rise to the level of disabling, that pain must be " constant, unremitting, and wholly unresponsive to therapeutic treatment."   *Chambliss*, 269 F.3d at 522; *Falco*, 27 F.3d at 163; *Wren*, 925 F.2d at 128.   The decision arising from the ALJ' s discretion to determine whether pain is disabling is entitled to considerable deference.   *See Chambliss*, 269 F.3d at 522; *Wren*, 925 F.2d at 128; *James*, 793 F.2d at 706.   However, an ALJ may discount subjective complaints of

27

pain as inconsistent with other evidence in the record.  *Dunbar v. Barnhart*, 330 F.3d 670, 672 (5th Cir. 2003) (citing *Wren*, 925 F.2d at 128 (citation omitted)).

At the administrative hearing, Gardner testified she suffered from back pain which is corroborated by the record.  (R. 43, 207, 215, 219, 302).  Gardner, however, worked as a secretary for years while experiencing back pain.  (R. 43).  She testified that in conjunction with her seizures, the pain is now unbearable because she tends to fall often.  *Id.*  An x-ray of Gardner's lumbar spine performed in May 2004 showed only a possible mild compression deformity of the L1 vertebral body.  (R. 269).  Moreover, in June 2003, Dr. Kuruvilla reported that Gardner's chronic back pain did not cause Gardner any significant limitations.  (R. 219).  Based on the evidence, the ALJ properly assessed Gardner's subjective symptoms.  (R. 23).

### 3.  *Residual Functional Capacity*

Under the Act, a person is considered disabled:

> only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [she] lives, or whether a specific job vacancy exists for [her], or whether [she] would be hired if [she] applied for work.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).  If a claimant demonstrates that she cannot perform her past relevant work, the Commissioner bears the burden of proving that her functional capacity, age, education, and work experience allow her to perform work in the national economy.  *See Brown v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Masterson*, 309 F.3d at 272; *Watson v. Barnhart*, 288 F.3d 212, 216 (5th Cir. 2002); *Myers*, 238 F.3d at 619; *Greenspan*, 38 F.3d at 236.  Once the Commissioner fulfills this burden by pointing out potential alternative employment, the

claimant, in order to prevail, must prove that she cannot perform the alternate work suggested. *See Masterson*, 309 F.3d at 272; *Boyd*, 239 F.3d at 705; *Shave v. Apfel*, 238 F.3d 592, 594 (5th Cir. 2001); *Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir. 2000).

To determine whether an applicant can return to a former job or, if never employed, can perform substantial work in the national economy, the regulations require the ALJ to evaluate the applicant's RFC. *See Carter v. Heckler*, 712 F.2d 137, 140 (5th Cir. 1983) (citing 20 C.F.R. §§ 404.1561, 416.961). This term of art merely designates the ability to work despite physical or mental impairments. *See id.*; *see also* 20 C.F.R. §§ 404.1545, 416.945. "Residual functional capacity" combines a medical assessment with the descriptions by physicians, the applicant or others of any limitations on the applicant's ability to work. *See id.* When a claimant's RFC is not sufficient to permit her to continue her former work, then her age, education, and work experience must be considered in evaluating whether she is capable of performing any other work. See 20 C.F.R. §§ 404.1561, 416.961. The testimony of a vocational expert is valuable in this regard, as "he [or she] is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed." *Carey*, 230 F.3d at 145; *see also Masterson*, 309 F.3d at 273; *Vaughan v. Shalala*, 58 F.3d 129, 132 (5th Cir. 1995); *Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir. 1986). In the absence of contrary evidence, the ALJ may properly rely on the testimony of a vocational expert in reaching a conclusion regarding a claimant's RFC to perform work available in the national economy. *See Masterson*, 309 F.3d at 273.

Moreover, under certain circumstances, the ALJ's application of the medical-vocational guidelines set forth in Appendix 2 of Subpart P of the regulations, also referred to as the grids,

without testimony from a vocational expert, is sufficient to assess whether a claimant is able to work or is disabled under the Act. *See Heckler v. Campbell*, 461 U.S. 458, 467, 470 (1983). As the Supreme Court explained in Campbell:

> These guidelines relieve the Secretary of the need to rely on vocational experts by establishing through rulemaking the types and numbers of jobs that exist in the national economy. They consist of a matrix of the four factors identified by Congress—physical ability, age, education, and work experience—and set forth rules that identify whether jobs requiring specific combinations of these factors exist in significant numbers in the national economy. Where a claimant' s qualifications correspond to the job requirements identified by a rule, the guidelines direct a conclusion as to whether work exists that the claimant could perform. If such work exists, the claimant is not considered disabled.

461 U.S. at 461-62 (footnotes omitted). The Court elaborated:

> Each of these four factors is divided into defined categories. A person' s ability to perform physical tasks, for example, is categorized according to the physical exertion requirements necessary to perform varying classes of jobs—*i.e.*, whether a claimant can perform sedentary, light, medium, heavy, or very heavy work. 20 C.F.R. § 404.1567. Each of these work categories is defined in terms of the physical demands it places on a worker, such as the weight of objects [she] must lift and whether extensive movement or use of arm and leg controls is required. *Ibid.*

*Id.* at 462 n.3.

Under the regulations, impairments can be either exertional or nonexertional. *See Sykes v. Apfel*, 228 F.3d 259, 263 (3d Cir. 2000). Impairments are classified as exertional if they affect the claimant' s ability to meet the strength demands of jobs. *Id.* The classification of a limitation as exertional is related to the United States Department of Labor' s classification of jobs by various exertional levels (sedentary, light, medium, heavy, and very heavy) in terms of the strength demands for sitting, standing, walking, lifting, carrying, pushing, and pulling. *See id.*; *see also*

20 C.F.R. § 404.1569(a).  All other impairments are classified as nonexertional.  *See Sykes*, 228 F.3d at 263.

In evaluating RFC, the Fifth Circuit has looked to SSA rulings ("SSR").  The Social Security Administration's rulings are not binding on this court, but they may be consulted when the statute at issue provides little guidance.  *See Myers*, 238 F.3d at 620 (citing *B.B. ex rel. A.L.B. v. Schweiker*, 643 F.2d 1069, 1071 (5th Cir. 1981)).  In *Myers*, the Fifth Circuit relied on SSRs addressing residual functional capacity and the interplay of exertional and nonexertional factors:

> First, SSR 96-8p provides that a residual functional capacity (RFC) "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis."  "A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule."  "The RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities."  "However, without the initial function-by-function assessment of the individual's physical and mental capacities, it may not be possible to determine whether the individual is able to do past relevant work. . . ."  RFC involves both exertional and nonexertional factors.  Exertional capacity involves seven strength demands:  sitting, standing, walking, lifting, carrying, pushing, and pulling.  "Each function must be considered separately."  "In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis. . . ."  The RFC assessment must include a resolution of any inconsistencies in the evidence.

*Id.* (quoting 61 Fed. Reg. 34474-01 (July 2, 1996)).  The court also noted that SSR 96-9p defines exertional capacity as the aforementioned seven strength demands and requires that the individual's capacity to do them on a regular continuing basis be stated.  *See id.*  Thus, to determine that an applicant can do a given type of work, the ALJ must find that the applicant can meet the job's exertional and nonexertional requirements on a sustained basis and can maintain regular employment.  *See Watson*, 288 F.3d at 218; *Singletary v. Bowen*, 798 F.2d 818, 821 (5th

31

Cir. 1986); *Carter*, 712 F.2d at 142 (citing *Dubose v. Mathews*, 545 F.2d 975, 977-78 (5th Cir. 1977)).

When a claimant suffers only exertional impairments and an ALJ's findings of residual functional capacity, age, education, and previous work experience coincide with the grids, the Commissioner may rely exclusively on the medical-vocational guidelines to determine whether work exists in the national economy which the claimant can perform. *See Newton*, 209 F.3d at 458 (citing *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987); 20 C.F.R. § 404.1569(b)). Nevertheless, "use of the grid rules is only appropriate 'when it is established that the claimant suffers only from exertional impairments, or that the claimant's nonexertional impairments do not significantly affect [her] residual functional capacity.' " *Watson*, 288 F.3d at 216 (quoting *Crowley*, 197 F.3d at 199); *accord Loza*, 219 F.3d at 398; *Newton*, 209 F.3d at 458. If the claimant suffers from nonexertional impairments or a combination of exertional and nonexertional impairments, then the Commissioner must rely on a vocational expert to establish that suitable jobs exist in the economy. *See id.* Therefore, before applying the grids, it must be determined whether nonexertional factors, such as mental illness, significantly affect a claimant's RFC. *See Loza*, 219 F.3d at 399; *Newton*, 209 F.3d at 459.

### a. *Hypothetical to Vocational Expert*

Gardner argues that the ALJ's hypothetical to the VE failed to include all of her limitations. Specifically, Gardner argues the ALJ did not include any limitations relating to her alleged mental impairment or her alleged seizure disorder. A hypothetical question to a VE is only deemed defective and in error when (1) it fails to reasonably incorporate all of the disabilities recognized by the ALJ, and (2) the claimant is not afforded the opportunity to correct possible

deficiencies in the ALJ's question. *See Boyd*, 239 F.3d at 707; *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994).

Contrary to Gardner's contention, the ALJ's hypothetical question to the VE included limitations related to her seizure disorder (*e.g.*, limitations including "no crawling, balancing, climbing of ladders or scaffolds. Avoidance of hazards of heights, vibrations, and dangerous machinery operation"). (R. 71). These limitations were the same restrictions found in Gardner's physical residual functional capacity examination which took place on July 14, 2003. (R. 221, 223-235).

With respect to her alleged mental impairment, the ALJ's hypothetical to the VE was improper. As set forth above, the record evidence demonstrates that Gardner had certain mental functional limitations. Indeed, in Dr. Lankford's mental residual functional capacity evaluation, Gardner was found to have marked limitations in understanding and remembering detailed instructions as well as carrying them out. (R. 243). Moderate limitations were found in Gardner's ability to understand and remember very short and simple instructions, as well as her ability to carry them out. (R. 243). In regards to social functioning and adaptation, moderate limitations were found in Gardner's ability to: accept instructions and respond appropriately to criticism from supervisors, respond appropriately to changes in the work setting, and travel to unfamiliar places or use public transportation. (R. 244). An impairment is severe if it significantly limits a claimant's ability to perform basic work activities. 20 C.F.R. § 404.1520(c). The regulations define the ability to perform basic work activities as the ability necessary to perform most jobs, including:

(1)   physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;

(2)   capacities for seeing, hearing, and speaking;

(3)   understanding, carrying out, and remembering simple instructions;

(4)   use of judgment;

(5)   responding appropriately to supervision, co-workers and usual work situations; and

(6)   dealing with changes in a routine work setting.

20 C.F.R. §§ 404.1521, 416.921.

Dr. Lankford summarized Gardner's functional capacity assessment by noting that "claimant can understand, remember and carry out only simple instructions, make simple decisions, attend and concentrate for extended periods and perform activities within a schedule." (R. 245). Although, Dr. Lankford noted Gardner could understand and carry out simple instructions, he found her to have moderate limitations in performing daily activities, responding to supervision, and dealing with changes in a routine work setting. (R. 244). This evaluation corroborated Dr. Lehman's previous findings. (R. 208-213). The ALJ should have included such mental limitations in his hypothetical to the VE. *See Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994).

Part one of the test is not met here because the ALJ's hypothetical question to the VE did not include any of Gardner's limitations resulting from her alleged mental impairment. As the first prong of the test is not met, the second prong need not be addressed.[16] *See Boyd*, 239 F.3d at 707 (noting that *Bowling* did not hold that a party's failure to point out the problems in a

---

[16] Notwithstanding, Gardner's attorney adequately cross-examined the VE, asking whether an individual who had difficulty remembering simple processes, would she be to work in unskilled jobs that were available in the national economy. The VE responded that if the individual was not able to remember two to three step processes, no competitive employment would be available. (R. 73).

defective hypothetical automatically salvages that hypothetical as a proper basis for a determination of non-disability).   Only where the testimony by the VE is based on a correct account of a claimant's qualifications and restrictions, may an ALJ properly rely on the VE's testimony and conclusion. *See Leggett v. Chater*, 67 F.3d 558, 565 (5th Cir. 1995).   Unless there is evidence in the record to adequately support the assumptions made by a VE, the opinion expressed by the VE is meaningless.   *See Bowling*, 36 F.3d at 436.

The ALJ has a duty to develop the facts fully and fairly relating to an applicant's claim for disability benefits.   If the ALJ does not satisfy his duty, his decision is not substantially justified. *See Boyd*, 239 F.3d at 708 (citing *Newton*, 209 F.3d at 458; *Ripley*, 67 F.3d at 557).   Where the ALJ relied on testimony elicited by a defective hypothetical question, the ALJ did not carry his burden to show that despite the claimant's impairments, the claimant can perform available work. *Id*.   In the absence, as here, of clear testimony from the VE, or other credible evidence in the record that jobs existed in sufficient numbers in the national economy to accommodate all of Gardner's exertional and nonexertional limitations, substantial evidence to support the ALJ's finding of no disability is lacking, and the Commissioner has failed to meet his burden of proof on this issue.

Accordingly, the case must be remanded for the ALJ to identify the specific elements of Gardner's mental RFC, articulate each of her functional limitations in a complete hypothetical question to a vocational expert, to ascertain whether any work exists that Gardner is capable of performing.

**III.**     ***Conclusion***

Accordingly, it is therefore

35

**ORDERED** that Gardner's Motion for Summary Judgment (Docket Entry No. 18) is **GRANTED**.  It is further

**ORDERED** that the Commissioner's Motion for Summary Judgment (Docket Entry No. 20) is **DENIED**.  It finally

**ORDERED** that the case is **REVERSED** and **REMANDED** to the Commissioner for a new hearing to properly consider the severity of Gardner's alleged mental impairments, to incorporate Gardner's alleged mental functional limitations in a hypothetical question to the VE, and to develop clear testimony from a VE regarding jobs, if any, Gardner is capable of performing considering all of her limitations.

Calvin Botley
United States Magistrate Judge

**SIGNED** at Houston, Texas on this the 21st day of March, 2007.